**PEOPLE'S BANK & TRUST COMPANY**

v.

**The UNITED STATES.**

No. 181–82C.

United States Claims Court.

Jan. 21, 1987.

K. Richard Hawley, Mt. Vernon, Ind., attorney of record, for plaintiff.

Sharon Y. Eubanks, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

YOCK, Judge.

In this contract case, the plaintiff bank seeks recovery from the Government of amounts extended in the form of an interim loan to a farmer, pending the closing of the farmer's previously approved Farmers Home Administration (FmHA) disaster emergency loan. The FmHA cancelled the loan to the farmer before there was a formal closing and denied any liability to the plaintiff bank based on the alleged interim financing agreement.

Upon consideration of the entire trial record, including appropriate post-trial briefings and findings, the Court concludes that the Government prevails in this contract dispute.

### Facts

Steven A. Strupp and his wife, Rebecca, were a farming couple living near the small farming community of Rosiclare in Hardin County, Illinois. Hardin County is located in the southeastern corner of Illinois and borders the Ohio River and the State of Kentucky. Mt. Vernon, Indiana, is located some 70 miles northeast of Rosiclare, and Metropolis, Illinois, is located some 40 miles southwest.

Starting in May of 1980, the Strupps borrowed some $68,500 from the People's Bank & Trust Company (bank or plaintiff), a commercial state banking institution lo-cated in Mt. Vernon, Indiana. The money was loaned to provide operating funds to the Strupps for their farming operation in Hardin County and was to be repaid when their 1980 crops had been harvested. Both promissory notes written on the loan were due on January 9, 1981, and were secured by liens taken on the crops and on the farm machinery owned by the Strupps.

The summer and fall of 1980 proved to be a disaster for many farmers in the southern part of Illinois. The drought was so severe that farmers in Hardin County (along with many other counties in the vicinity) were declared eligible for disaster emergency loans from the FmHA.[1] The Strupps were among those farmers that were adversely affected by the drought. In January 1981, when their loan with the plaintiff became due, the Strupps were only able to pay some $23,000 of the total amount due, leaving them in default by some $50,000.

After discussing their difficulties with the officials at the bank, it became clear to the Strupps that the bank would not extend any further credit to them for the upcoming 1981 growing season. Further, the bank encouraged them to find alternative ways to pay off the existing loan in default so that the bank would not have to foreclose on their machinery. With this in mind, the Strupps decided to apply to the FmHA for a disaster emergency loan and so advised the bank. Thereafter, on February 8, 1981, the Strupps went to the FmHA county office in Metropolis, Illinois,[2] and applied for a disaster emergency loan that hopefully would give them enough money to operate their farm for the 1981 growing season and also pay off some or all of their loan that was in default with the bank.

Shortly after applying for their disaster emergency loan, the Strupps visited with Mr. Roy Wilke at the FmHA office in Me-

---

**1.** The Farmers Home Administration (FmHA) is an agency within the United States Department of Agriculture that provides credit for those in rural America who are unable to get credit from other commercial sources at reasonable rates and terms. 7 U.S.C. §§ 1921–96 (1982). It is often referred to as the rural lender of last resort.

**2.** The FmHA county office in Metropolis, Illinois, served the rural communities in Hardin, Pope, and Massac Counties during the time frame involved in this case.

tropolis. Mr. Wilke was employed part time as a Loan Assistant (Agricultural) by the FmHA office and was carrying the working title of Economic Emergency Loan Supervisor. He was also a local farmer in the area. Mr. Wilke explained to the Strupps that the process may take six weeks to two months to complete before the loan is approved. He indicated that the application would have to be processed which would include the necessary credit checks on the value of their land and equipment. After the credit checks and farm visits were completed, the loan application would be forwarded to the FmHA County Committee for its certification as to the Strupps' eligibility for the emergency loan. Once the County Committee had acted, the loan finally had to be approved by the FmHA County Supervisor, which in this case was Mr. James H. Harris. If the County Supervisor approved the loan, the funds would be requested from the FmHA regional disbursing office in Kansas City, Kansas, and the loan documents referred to an escrow agent (attorney) for title evaluations. Once the legal evaluations had been satisfactorily concluded, there would be a closing and the Strupps would receive their money. When the Strupps expressed concern that the loan application process may take too much time to do them any good because the spring planting time was quickly approaching, Mr. Wilke advised them not to worry. He explained that once the loan was approved, he would work with them to find a commercial lender who would loan them "interim money" until their emergency loan could be closed with the FmHA. The FmHA would provide a "commitment letter" which would guarantee to the commercial lender that when the loan had been closed, the lender would be paid all its "interim money" that it had loaned to the Strupps. The money to be paid to the commercial lender would, of course, come from the money that the FmHA would be loaning to the Strupps. Mr. Wilke explained that this was common practice with the FmHA to do this with "late loans" such as this loan, and that the commercial bank would be happy to loan

the Strupps the "interim money" under these circumstances. When the Strupps explained their prior dealings with the plaintiff bank to Mr. Wilke, he indicated that People's Bank was undoubtedly the bank from which they should seek their "interim loan."

The Strupps then left the FmHA office and advised the plaintiff bank of what they had learned about the emergency loan process. The bank responded favorably to this information and decided not to go forward with any foreclosure proceedings pending the outcome of the Strupps' loan application with the FmHA.

On March 20, 1981, the FmHA County Committee met and certified the Strupps as eligible for a disaster emergency loan from the FmHA.

Starting on March 24, 1981, a series of telephone calls were placed between the FmHA county officials in Metropolis and the officers of the People's Bank in Mt. Vernon. The agreements and understandings reached in these calls form the nucleus for the alleged contract between the parties in this dispute. On March 24, Ms. Eleanor Hogan, who is a vice president at the Peoples Bank and an officer qualified to make loans, contacted the FmHA County Supervisor, Mr. James Harris, to determine what the FmHA planned to do in regard to the Strupps' loan application. At this point, of course, the bank was aware that the Strupps had applied for an FmHA disaster emergency loan and had discussed an "interim loan" with the FmHA. The bank had not, however, heard anything at all for approximately one month and, thus, was "checking in" with the FmHA to determine the status of the loan application. During the course of this initial conversation, Ms. Hogan explained to Mr. Harris the position that the Strupps were in at their bank, and discussed the security it held in the Strupps' machinery, on which they could foreclose at any point. She suggested the bank's willingness to grant "interim money" to the Strupps if the FmHA would be willing to refinance part or all of the Strupps' debts at the bank.

Mr. Harris suggested that they may be willing to do this but only on a partial payment basis, and the bank would have to subordinate their prior liens on the Strupps' farm machinery to the FmHA's interests. After some further negotiations, both parties decided to review the matter further in their respective offices and get back to each other in several days. Mr. Harris did not want to commit the FmHA to the bank at this point until he had a further chance to firm up the FmHA's position. Ms. Hogan likewise needed to discuss the matter with Mr. K.W. Goss, the president and chief executive officer at the People's Bank, before making any binding commitments.

Two days later, on March 26, Mr. Roy Wilke from the FmHA called Mr. Goss (and Ms. Hogan) at People's Bank and firmed up the agreement. In that conversation, Mr. Wilke indicated that the Strupps' emergency loan would be approved, subject, of course, to the bank agreeing to do several things. First, the bank would have to agree to provide an "interim money" loan to the Strupps so that they could begin paying off some of the debts (machinery purchase, land purchase, etc.) that were due or soon to become due. In turn, the FmHA would repay the bank the interim money loaned out of the Strupps' FmHA emergency loan proceeds when that loan closed. Second, the bank had to agree to subordinate their security in the Strupps' machinery to the FmHA's interests, by signing a nondisturbance agreement in favor of the FmHA, that would guarantee that the bank would not foreclose on the machinery for some seven years (the life of the FmHA emergency loan). Third, the bank would have to agree to take only $12,000 immediately out of the FmHA loan funds, when the loan closed, in partial payment on the Strupps' $50,000 loan already in default. The bank would thereafter receive $10,000 per year out of the Strupps' farm earnings until the loan in default was paid in full. Mr. Goss accepted the agreement on behalf of the bank since it appeared that the FmHA was, in effect, bailing the bank out of an otherwise bad loan, even if it meant that the bank would not get the full $50,000 owed, for some five years. Mr. Goss did insist, however, on receiving an FmHA letter detailing the elements of the FmHA emergency loan agreement.

On April 1, 1981, Steven Strupp visited the bank in order to make arrangements for the interim loan. At that time, Mr. Strupp brought along a letter dated April 1, 1981, and signed by Mr. Roy Wilke which stated the following:

The County Committee has certified Steven Strupp eligible for a disaster loan to pay land debt of $22,000.00 plus miscellaneous debts. He has also been certified a crop loan in the amount of $104,000. The loans will be made pending County Supervisors' signature.

However, since the FmHA letter did not indicate that the loan had been approved, and did not detail other elements of the agreement that had been discussed between the FmHA and bank officials, the bank refused to complete the interim financing. Ms. Hogan advised Mr. Strupp that a more detailed FmHA letter would be necessary before they could complete the interim financing arrangement.

On April 2, 1981, Mr. Strupp returned to the FmHA office in Metropolis and asked Mr. Wilke for a more definite and detailed letter. Mr. Wilke, then drafted another letter, discussed the contents with Mr. Harris, and sent Mr. Strupp back to the bank with the redrafted letter. The letter, dated April 2, 1981, and signed by Mr. Wilke stated:

To Whom it May Concern:

Steve Strupp is approved for $79,380.00 at 5%—$40,800.00 will be used for refinancing, the remainder of $38,580.00 will be used for crop production money in 1981, and due back in one year. The $40,800.00 will be made for 7 years.

The uses of money will be set up as follows:

Refinancing $40,800.00

| | |
|---|---|
| Pay John Hoeloer [sic]: | $22,000.00 |
| Pay J.D. planter: | $ 2,800.00 |

Pay A.C. combine: $ 4,000.00
Peoples Bank: $12,000.00

The $38,580.00 plus $65,420.00 will be used for 1981 operating money. The $65,420.00 will be made at 13% and will also be due back in one year.

FmHA security for this loan will be: Land, crop lien, and second on machinery, subject to Peoples Bank and Trust Co.

Money will be available in approximately 45 days for above refinancing and crop money will be available at the same time.

That same day, Mr. Strupp returned to the bank with the redrafted letter. Upon reviewing the letter, Ms. Hogan called Mr. Wilke once again to confirm that the bank would be reimbursed for all interim disbursements made out of the FmHA loan proceeds when the loan closed. She also confirmed that the FmHA desired the bank to loan interim money to the Strupps immediately for the purpose of paying a land payment of $22,000 to Mr. John Hoerler, for the farm that the Strupps had purchased on a contract for deed and the $2,800 payment due on the Strupps' John Deere planter. Based on that letter, that telephone call, and the oral agreements made between the FmHA officials and the bank officials in the March telephone calls, the bank agreed with the FmHA to loan the Strupps the "interim money" that they needed until the FmHA emergency loan could be closed. On April 2, the bank advanced $24,800 to the Strupps secured by a promissory note in that amount. The next day, April 3, 1981, the bank provided the Strupps with an additional $50,000 in interim financing, secured by another promissory note, to be used as operating money for the 1981 crop year, and advanced $800 directly to a landlord for cash rent for part of the land Mr. Strupp was farming.

The Strupps' FmHA loan was formally approved by Mr. Harris, in a "Request for Obligation of Funds," dated April 3, 1981. This document stated, in pertinent part:

41. I HEREBY CERTIFY that all of the committee and administrative determinations and certifications required by Farmers Home Administration regulations prerequisite to providing assistance of the type indicated above have been made and that evidence thereof is in the docket, and that all requirements of pertinent regulations have been complied with. I hereby approve the above-described assistance in the amount set forth above, and by this document, subject to the availability of funds, the Government agrees to advance such amount to the applicant for the purposes of and subject to conditions prescribed by Farmers Home Administration regulations applicable to this type of assistance.

[Signature]
_____
JAMES H. HARRIS (Signature of Approving Official)

Date Approved: 4–3–81 Title: County Supervisor

42. TO THE APPLICANT: As of this date 4–3–81 this is notice that your application for the above financial assistance from the Farmers Home Administration has been approved, as indicated above, subject to availability of funds and other conditions required by the Farmers Home Administration. If you have any questions contact the County Supervisor.

The Strupps were approved by the FmHA for a total of $144,800, divided between $79,380 for actual disaster losses, repayable in 7 years at a 5 percent interest rate and a $65,420 Annual Operating Emergency Loan, repayable in one year at a 13 percent interest rate. Under the regulations governing the disaster emergency loan program, the Strupps could not have gotten an emergency loan for operating purposes without first qualifying for and receiving an actual disaster loss loan.

That same day on April 3, 1981, Mr. Harris entered into the FmHA "running record," a handwritten record kept by the FmHA office recording actions taken by FmHA officials pertaining to the Strupps' loan, the following language:

*Position Statement* I am not 100% in agreement on this loan even though I approved it. Loan approved in part be-

cause of Congressional pressure through the District FmHA Office. Projected yields are only possible with very favorable climatic conditions. FmHA has had some bad experience with farmers in this area. [S/]James H. Harris.

Mr. Harris also indicated in the running record that a title opinion would be required and referred the matter of title clearance to Mr. Matthew Franklin, an attorney in Elizabethtown, Illinois, who was the only attorney in Hardin County approved by the FmHA to render title opinions and to act as "escrow agent" in the closing of FmHA loans.

Security required by the FmHA in order for the Strupps' emergency loans to be closed was to include a farm purchased on contract for deed by the Strupps from Mr. and Mrs. John Hoerler, located in Hardin County, Illinois. As of the time the Strupps applied for an FmHA loan on February 8, 1981, Mr. Strupp estimated that he had a $42,000 equity share in the Hoerler farm with an unpaid balance of $181,300, payable in annual installments of $22,000. In addition to the security to be taken by the FmHA in the Hoerler farm, the FmHA was also to take liens on the Strupps' future crops as well as their farm machinery.

On April 8, 1981, Ms. Hogan at the bank again spoke with Mr. Harris in regard to the future disbursements to be made to the Strupps under the interim financing agreement. Specifically, Ms. Hogan wanted to know how the bank would know what disbursements the FmHA would approve and authorize for payment and how the process should be accomplished. Mr. Harris advised her that he, the County Supervisor, would periodically meet with the Strupps to go over their bills and obligations as they accrued, and authorize in writing those debts that could be paid by the FmHA (and, thus, the bank under their interim financing agreement). The Strupps would then take the ledgers with Mr. Harris' approval written thereon and return to the bank to make the necessary disbursement arrange-

ments. He indicated further that the funds to be used for the debts authorized for payment by his signature could be deposited directly to a Strupps' checking account and the Strupps would make the payments by check to their creditors.[3] Mr. Harris confirmed this arrangement by letter of April 9, 1981, which stated in pertinent part:

Dear Ms. Hogan:

Attached is the list of bills and there [sic] amounts that Farmers Home Administration has scheduled for financing, when the Farmers Home Administration loan is closed. Per our discussion April 8, 1981.

Subsequently, by written notations placed on ledgers given to Ms. Hogan dated April 13, April 27, May 5, May 11, May 18, and June 1, Mr. Harris indicated that the expenses listed on the ledgers would be eligible for reimbursement to the bank when the FmHA loan was closed. Between April 3, and June 1, 1981, the bank disbursed $48,051.88 to the Strupps for payment on their farm operating expenses, as well as $24,800 for payment on their land and equipment purchases, for a total amount advanced of $72,851.88.

On May 6, 1981, Mr. Harris forwarded to Ms. Hogan the nondisturbance agreement that the bank had agreed to sign in the telephone conversation of March 26. That same day, the bank executed the agreement which formally bound the plaintiff not to repossess and foreclose on the Strupps' farm machinery until 1988 (the life of the FmHA loan) without first obtaining the written consent of the FmHA. Absent this agreement, the bank would have been able to foreclose on the Strupps farm machinery, since the Strupps were still, of course, in default on their 1980 loans to the plaintiff. Had the bank foreclosed on the machinery, the FmHA loan would have been useless, because, interestingly enough, no one yet has been able to figure out how to operate a farm without farm equipment.

---

**3.** It was not entirely clear from the record whether Mr. Harris would be a cosigner on the

checks or not. Presumably, the FmHA was a cosigner on the checks.

Around the first week of May 1981, the FmHA regional disbursing office forwarded two Government checks, representing the Strupps' approved FmHA loan, to the FmHA county office in Metropolis. However, these checks were returned near the end of May, since the loan was not ready for closing. FmHA regulations required Government checks to be returned and be reissued whenever a closing was not scheduled within a brief period of time. The closing had not occurred at this point because the FmHA had not yet received a preliminary title opinion from the escrow agent/attorney on the real estate (Hoerler farm) which was to be a significant part of the security for these loans. A notation in the FmHA running record on the Strupps' loan indicated that Mr. Harris had talked to the closing attorney on June 4, 1981, and had been promised the preliminary title opinion "in about one week." A later notation dated June 29, 1981, indicated that the title opinion would be forwarded by the attorney on that date. On July 27, 1981, when the title opinion had still not been delivered, Mr. Harris called the attorney's office and inquired. He was advised that the attorney was still waiting to receive some documents, but more importantly, he was advised that Mrs. Strupp had started divorce proceedings against Mr. Strupp. This news alarmed Mr. Harris since any divorce settlement or judgment could well affect the security that the FmHA was seeking to take in the Strupps' real estate and other property. The next day, Mr. Harris contacted Steven Strupp to verify the divorce information. Mr. Strupp confirmed that his wife was seeking a divorce and that the property settlement would consist of Mrs. Rebecca Strupp receiving two automobiles and a $6,000 cash payment. All the farm machinery, crops and real estate would remain in Steven Strupps' sole possession, and thus presumably remain available as security for the FmHA emergency loan. Nevertheless, Mr. Harris advised Mr. Strupp that he would have to see the final divorce decree before the loan could be closed. He then advised the closing attorney to hold up his preliminary title

opinion until the divorce was settled. He also called the bank to advise them of the divorce problem, and the fact that the pending divorce could delay the closing of the FmHA loan for some 30–60 days.

On August 31, 1981, Mr. Harris made a visit to Mr. Strupps' farm to view the crops and inspect the machinery. He reported in the running record that the crops looked good. He also noted at that time that the Strupps' divorce hearing would not be held before September 17, 1981.

On September 21, 1981, Mr. Harris was visited in his office by Mr. John Hoerler's son-in-law who advised him that Steven Strupp had just quitclaimed the Hoerler farm back to John Hoerler. Upon checking with county officials in Hardin County, Mr. Harris confirmed that the Hoerler farm had in fact been given back to the Hoerlers by the Strupps. Steven Strupp later confirmed to Mr. Harris that, in view of the loan closing taking so long, and the divorce, he had more or less given up on farming, and felt it best to give the land back to Mr. Hoerler.

The following day, on September 22, 1981, Mr. Harris called the bank to advise them that the FmHA loan would probably not be closed since the real estate that was to form a significant part of the security was now unavailable. In that conversation, Mr. Goss made it clear to Mr. Harris that the bank had advanced interim money to the Strupps based on a contract of guarantee they had with the FmHA, and the bank fully expected the FmHA to make good on the interim money advanced to the Strupps pursuant to that agreement. At this point, the bank had advanced the Strupps $72,851.88 in interim money, which was to be repaid out of the proceeds of the FmHA emergency loan when that loan was closed. This $72,851.88 was in addition, of course, to the $50,000 that was already owed to the bank by the Strupps on their 1980 loan which was still in default.

On October 21, 1981, Mr. Harris wrote a letter to Mr. Steven Strupp, advising him that unless the FmHA heard from him within two weeks in regard to his inten-

tions, his FmHA emergency loan would be cancelled. Not hearing anything more from Mr. Strupp in that time frame, Mr. Harris cancelled the loan on November 19, 1981.

Between November 9, 1981 and January 7, 1982, the bank was successful in collecting $17,882.22 from the Strupps' 1981 crop production and of that amount $9,235.70 was applied to interest on the promissory notes and the remaining amount was applied to reduce the principal. As of January 7, 1982, the balance owing on the notes, which evidence the interim financing advances made by the plaintiff bank, was $64,200.36.

This contract action by the bank against the FmHA followed.

In an earlier opinion dated March 29, 1985, this Court denied cross-motions by the parties for summary judgment since it appeared to the Court that material issues of fact were still in dispute. *See People's Bank & Trust Co. v. United States*, 7 Cl. Ct. 665 (1985). Following completion of discovery, trial was held December 3–6, 1985, at the Federal Courthouse in Evansville, Indiana.

### Discussion

In this contract dispute, the plaintiff presents three basic arguments. First, the plaintiff asserts that there was in fact a contract of guarantee in place between the bank and the FmHA in this matter. Second, the plaintiff contends that the FmHA employees involved herein had the requisite authority to enter into such a contract. Finally, the plaintiff argues that the contract itself was unconditional.

The defendant counters the plaintiff's legal position by denying that the FmHA employees had the requisite legal authority to enter into a contract of this type, or that it should be equitably estopped from asserting the Government's lack of authority under the facts presented. In the alternative, the Government posits that even if there was a valid contract in place, a condition precedent to recovery was not fulfilled, hence there could be no recovery.

The Court finds that the FmHA had the authority to, and that it did, in fact, enter into a contract with People's Bank & Trust Company to guarantee repayment of interim advances to the Strupps pending receipt of the approved emergency loan proceeds, but that this guarantee was conditional upon the closing of the loan. Therefore, since the loan never closed and the Government was not responsible for that failure to close, the defendant was under no contractual obligation to the plaintiff. Because of our finding on the authority issue, it is unnecessary to discuss whether or not the doctrine of equitable estoppel would apply if the authority matter were found lacking.

### A. Authority to Contract

It is an established proposition that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). *See also Housing Corp. of America v. United States*, 199 Ct.Cl. 705, 711–12, 468 F.2d 922, 925 (1972); *Lin v. United States*, 3 Cl.Ct. 213, 216 (1983); *Dalaly v. United States*, 3 Cl.Ct. 203, 206 (1983). The Government is not bound by acts of its agents beyond the bounds of those agents' actual authority. *Federal Crop Ins. Corp. v. Merrill, supra. See also C.P. Squire Contractors, Inc. v. United States*, 716 F.2d 865, 868 (Fed.Cir.1983); *City of Klawock v. United States*, 2 Cl.Ct. 580, 586 (1983), *aff'd*, 732 F.2d 168 (Fed.Cir.1984).

Before determining the nature of the contract between FmHA and the bank regarding interim loan funding, a determination must be made as to whether or not the FmHA employees involved here had the actual authority to enter into such a contract. The reason for this requirement is that under the jurisdiction given to this Court and its predecessor by the Tucker Act, liability of the United States under an express or implied contract can be created only by an officer of the Government law-

fully invested with the power to make such contracts or to perform acts from which they may be lawfully implied. *Eastern Extension, Australasia & China Telegraph Co. v. United States,* 251 U.S. 355, 365–66, 40 S.Ct. 168, 171–72, 64 L.Ed. 305 (1920). The representatives of the United States whose conduct is relied upon must have actual authority to bind the Government in contract. *Federal Crop Ins. Corp. v. Merrill, supra,* 332 U.S. at 384, 68 S.Ct. at 3; *Jascourt v. United States,* 207 Ct.Cl. 955, 521 F.2d 1406, *cert. denied,* 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 105 (1975).

■ Contract authority is found in the applicable statutes and regulations governing the FmHA, a Federal Government agency within the United States Department of Agriculture that is authorized to provide a supplemental source of credit to farmers and other rural residents when they are otherwise unable to obtain credit from private financial institutions. 7 U.S.C. §§ 1922, *et seq.* (Supp. V 1981). Within the Code of Federal Regulations, 7 C.F.R. §§ 1900 *et seq.* regulates the FmHA programs. Sub-part A is the general delegation of authority section, sub-part B is the FmHA appeal procedure, and sub-part C relates to the applicability of federal law and individual liability.

Powers granted under 7 C.F.R. §§ 1900 *et seq.* to FmHA officials are very broad. For instance, 7 C.F.R. § 1900.2 (1981) authorizes FmHA officials to

"[D]o and perform all acts necessary in connection with making and insuring loans, making grants and advances, servicing loans and other indebtedness and obtaining, servicing and enforcing security and other instruments related thereto * * *.

And further in the same subsection,

The authority includes, but is not limited to, the authority to: [there follows a list

of items dealing with contracts, loans, etc.].

In addition, 7 C.F.R. § 1901.2 (1981) states:

The loan and grant approval authorities will be given to the County Supervisor and District Director to the maximum extent possible, consistent with program requirements and available resources.

FmHA programs are many and varied, and include such subject areas as farm operating loans, 7 C.F.R. § 1941 (1981); farm economic emergency loans, 7 C.F.R. §§ 1945.101–50 (1981); farm disaster emergency loans, 7 C.F.R. §§ 1945.1–.92 (1981); farm ownership, soil and water, and recreation loans, 7 C.F.R. § 1943 (1981); community facility loans, 7 C.F.R. § 1942.1 (1981); rural housing loans, 7 C.F.R. § 1944 (1981) and industrial development grants, 7 C.F.R. §§ 1942.301–50 (1981). The FmHA programs include both direct loans (*i.e.,* FmHA to lender) and guaranteed loans (*i.e.,* FmHA guaranteeing of commercial loans to lenders). The loan program that is of concern in this case is the disaster emergency loan, and the regulations for this Emergency Loan (EM) are contained in 7 C.F.R. §§ 1945.1 *et seq.* (1981).

A review of the 7 C.F.R. § 1945 regulations, in effect at the time of the Strupp loan, reveals absolutely no mention of whether FmHA officials were granted the authority to enter into a contract to guarantee repayment of interim advances from other commercial (bank) sources.[4] The 1981 regulations are simply silent on this point. The regulations in this EM loan area were amended on March 11, 1983, by 7 C.F.R. § 1945.167(i), to specifically prohibit this practice, but the amendment has no direct application to this 1981 case. To further confuse matters, the FmHA regulations for the other types of loan programs all differed in their treatment as to whether there could be guaranteed loans by the FmHA or not. For example, the FmHA regulations specifically provided for the

---

**4.** Aside from the regulations, the record is also devoid of any policy directives, internal memoranda, or training manuals which prohibited the guaranteed repayment of interim advances.

The Government was specifically asked to make this information available to the Court if it in fact existed.

guaranteed repayment of interim commercial financing when community facilities loans and rural housing loans were closed. *See* 7 C.F.R. § 1942.17(n)(2) (1981) and 7 C.F.R. § 1944.175(a) (1981). On the other hand, the regulations in regard to farm operating loans specifically provided that FmHA employees could not guarantee any repayments of interim advances from other commercial sources. *See* 7 C.F.R. § 1941.-23(b)(1) (1981).

The complete absence of any regulations speaking to this authority matter at issue here is extremely troubling. It is troubling because the record in this case clearly indicates that the FmHA employees involved were *acting* as if they had the necessary authority. Starting with FmHA County Supervisor Harris' telephone call to the bank on March 24, 1981, through to his written correspondence with the bank in regard to the disbursements that the FmHA were authorizing to be made, ending in June 1981, the bank clearly was given the legitimate impression that FmHA county officials were authorized to guarantee this type of loan. When Mr. Wilke called the bank back on March 26, 1981 on behalf of the FmHA county supervisor to confirm the agreement that Ms. Hogan and Mr. Harris had discussed two days earlier, he was using language that contracting parties use. There was a meeting of the minds on the basic outline of the contract agreement. The bank would provide badly needed interim financing for the Strupps in exchange for the FmHA commitment that the interim financing would be repaid when the FmHA emergency loan closed. Also, the bank would receive $12,000 immediately from the FmHA loan proceeds to be applied to the Strupps' 1980 indebtedness to the bank. The bank in turn would have to execute a nondisturbance agreement in favor of the FmHA.

In fact, Mr. Wilke testified at trial that he believed FmHA employees did have the authority to enter into guarantee contracts. Why else, he testified at trial, would the letter of April 2, 1981, be called by the FmHA a "commitment letter"? He also testified that commitment letters such as was used in this case, were not all that unusual in "late loan" cases such as this, and that he had seen several of those letters used in the past in the FmHA county office. Although Mr. Harris was somewhat less candid in his testimony on the authority point, he too preferred to discuss the dispute in terms of a contract condition precedent that had not occurred rather than confront the authority question directly.

The absence of regulations in this emergency loan subject area is also troubling for another and perhaps more serious reason. That is, even if the bank had any doubts about the FmHA's authority to guarantee a contract in this matter, a perusal of the applicable federal regulations would have shown absolutely no prohibition against such a guarantee. This lack of prohibition is particularly misleading in light of the specific prohibition *denying* authority to guarantee interim advances found in the regulations governing the farm operating loan program, and in light of the specific authority *granting* permission in the community facilities and rural housing program areas.

The defendant has attempted to use the lack of definitive permission or prohibition found here to argue that the plaintiff, who has the burden of showing the authorization of the FmHA agent on which it relies, has failed to meet that burden. However, the case law, in which a plaintiff was found to have failed to meet that burden, is not strictly applicable here. The case law, in general, places the responsibility on the plaintiff to determine from the applicable regulations whether the Government, or its agent, has or does not have the authority to act. In this case, there was no regulation on point. *See Loftin v. United States,* 6 Cl.Ct. 596 (1984), *aff'd,* 765 F.2d 1117 (Fed.Cir.1985). This distinction is borne out by a wide range of cases in which the Government and a private party took action which was found to be without effect because of lack of authority on the part of the Government agent. The evidence of the lack of authority in these cases was

found in a specific regulation prohibiting such action.

For example, the seminal case of *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), concerned insurance of wheat crops by an agency of the Department of Agriculture. A farmer applied for insurance and orally informed the agent that of the 460 acres of spring wheat he was planting, 400 were to be reseeded on winter wheat acreage. (The formal application did not disclose that any part of the insured crop was to be reseeded). The farmer was informed by an agency branch office that the entire crop was insurable, while in reality the insurance of spring wheat reseeded on winter wheat acreage was specifically prohibited by agency regulations. The court, denying plaintiff relief, imposed upon him the burden of ascertaining the agency authority, in spite of contrary representations by an employee of the agency, holding that since the regulations specifying conditions under which the agency would insure wheat crops were published in the Federal Register, these regulations were binding on him, regardless of plaintiff's lack of awareness of their existence. There have been numerous other cases where evidence of lack of authority has been shown by pointing to a specific prohibition within a regulation. *See Southern States Henry Co-op., Inc. v. United States*, 4 Cl.Ct. 370 (1984) (specific prohibition against repayment of interim loan advances by a bank for FmHA operating loans); *Exchange Bank of Mound City v. United States*, 9 Cl.Ct. 651 (1986) (issuance of more than one subordination agreement by FmHA on borrower crops to lending bank specifically prohibited by FmHA regulation). *Cf. Hamilton Bank v. United States*, 6 Cl.Ct. 267 (1984).

Requiring citizens dealing with the Government to determine the absence of authority from a confusing, technical and hard-to-find regulation, following a representation from the Government to the contrary, is bad enough when the prohibitory regulation has been printed. Expecting a plaintiff in this situation to determine lack of authority when no regulation even exists is well-nigh intolerable.

As Mr. Wilke testified at trial, at the time of the Strupps' loan application in the spring of 1981, there was a high volume of other applications under the disaster loan program since so many farmers were affected by the drought of 1980. The FmHA county office was having trouble keeping up with the demand for services. The turn-around time for loan "paperwork" was so slow that to get the money out to the farmers, *i.e.*, to realistically do the job of disaster emergency funding, something had to be done to speed up the process. The major difficulty presented was that by the time the FmHA funds were provided, it was too late in the farming cycle for those funds to be effective. For example, Mr. Strupp applied to the FmHA in early February. His loan was not formally approved until April 3rd. Actual funding following loan approval normally took approximately 45 to 60 days, so that even without undue delays, it would have been mid-to-late May before Mr. Strupp actually received his money. This would have been extremely late in the season to start planting crops, resulting in a short growing season, poor cash return, and a risk that Mr. Strupp would not be able to repay his loans and would perhaps lose his farm entirely.

Because of the particular characteristics of these disaster emergency loans, some system of quick interim funding was needed to get the money out to the farms expeditiously. An essential part of persuading commercial banks to advance these funds (and to assure repeat business for the FmHA), was the commitment by the FmHA that if the bank complied with the terms of its agreement with the FmHA, it would be reimbursed when the loan closed.

Taking into consideration all of the evidence presented in the trial of this action, the Court concludes that there was an informal system in place within the FmHA, by which, in appropriate cases, the FmHA would guarantee to commercial banks that they would be repaid any interim advances made to rural applicants upon the closing

of the applicants' disaster emergency loans with the FmHA. Since there is no prohibition to this practice contained in any statute, regulation, or internal policy manual or directive, and taking into consideration the broad powers the FmHA granted to its county officials to carry out their loan-making functions, this Court finds and determines that the various county offices (and officials) within the FmHA had the actual authority, under the regulations existing in 1981, to enter into contracts with commercial lenders to guarantee the repayment of interim financing granted to FmHA rural applicants.

## B. The Contract Obligation

■ Section 1491 of Title 28 of the United States Code grants this Court jurisdiction over claims against the United States Government founded upon any express or implied-in-fact contract with the United States. The Court, however, has no jurisdiction to render judgment against the United States based upon a contract implied-in-law. *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1256 (1970); *Putnam Mills Corp. v. United States*, 202 Ct.Cl. 1, 479 F.2d 1334 (1973).

■ An express contract is an agreement or mutual assent by the parties manifested in words, oral or written. *Gratkowski v. United States*, 6 Cl.Ct. 458, 461 (1984). Even when a party contracts with the Federal Government, it is not essential that the contract be in written form. *Narva Harris Construction Corp. v. United States*, 216 Ct.Cl. 238, 244, 574 F.2d 508, 511 (1978); *Penn-Ohio Steel Corp. v. United States*, 173 Ct.Cl. 1064, 1085, 354 F.2d 254, 266–67 (1965). Also, this Court, and its predecessor, have on various occasions found for contractors that have alleged and proven implied-in-fact contracts. *Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1352 (Fed.Cir.1983); *Terteling v. United States*, 167 Ct.Cl. 331, 339–40, 334 F.2d 250, 255–56 (1964); *Tidewater Coal Exchange v. United States*, 67 Ct.Cl. 590, 600 (1929).

■ An implied-in-fact contract is a real contract in the usual sense, although the parties involved may not have used specific words of agreement. *See J.C. Pitman & Sons, Inc. v. United States*, 161 Ct.Cl. 701, 704–05, 317 F.2d 366, 368 (1963). Although a contract implied-in-fact is based on the conduct of the parties and the other circumstances surrounding the transaction, it requires a showing of the same contractual elements as those required to establish an express contract. The requirements of mutuality of intent and lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs. *Fincke v. United States*, 230 Ct.Cl. 233, 675 F.2d 289 (1982); *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977).

■ In this matter, the Court finds that the telephone conversation of March 26, 1981, and the agreements discussed and agreed to at that time between the parties formed the basis for an express contract in this case. The later telephone calls, written correspondence, actions and forebearances were but further vivid indications that an express contract had been formed at that time. In order to prove that an express oral contract existed, the plaintiff had to prove to this Court that the parties intended to be bound and that they expressed their intentions in an understandable way. It was necessary to establish both a definite offer and a definite acceptance. This, the plaintiff was able to establish.

It is clearly established that in the telephone conversation of March 26, 1981, Mr. Wilke, on behalf of Mr. Harris, the FmHA County Supervisor, and Mr. Goss and Ms. Hogan for the bank, set out the basic outlines of the contract terms. The bank's terms were not to sue the Strupps on their default in payment of their 1980 indebtedness to plaintiff, not to disturb the collateral held as security for that indebtedness, and to provide interim financing for the Strupps. The FmHA terms were to pay

the bank $12,000 from the Strupp loan proceeds to be applied to the 1980 Strupp indebtedness and also to reimburse the bank from the emergency loan proceeds for interim financing made by the bank to the Strupps after the loan had closed.

After Mr. Goss indicated in that conversation that the bank would have to see a letter or other document from the FmHA which formally attested that the loan had been approved before he would authorize any interim money disbursements to the Strupps, the FmHA provided the bank with the letter of April 2, 1981, which, among other things, stated that the Strupps' loan had been approved and that the land would be taken as security for the loan. In reliance on the April 2, 1981 letter, the plaintiff began to advance the necessary interim funds to the Strupps and later executed a nondisturbance agreement forwarded to it by Mr. Harris on May 6, 1981, formally binding the plaintiff not to exercise its lien rights until 1988.

As further evidence of the parties' agreement, on April 2, 1981, when Mr. Strupp took the April 2 letter to the bank, Ms. Eleanor Hogan called Mr. Wilke at FmHA and asked him if she should make disbursements as stated in the letter by making the checks directly to Mr. Hoerler and John Deere. She was again informed by Mr. Wilke that People's Bank & Trust Company would be reimbursed for these disbursements out of the loan proceeds and was authorized specifically to make these payments in the sum of $22,000 directly to Mr. John Hoerler for farm land and the sum of $2,400 for the Strupps' John Deere tractor.

Subsequently, on April 8, 1981, Ms. Hogan spoke with Mr. Harris regarding the disbursements of the interim financing. Mr. Harris informed Ms. Hogan that she could deposit the money directly to the Strupps' checking account and that he would be authorizing all disbursals on the loan. On April 9, 1981, Mr. Harris wrote a letter to the bank indicating that the attached list of bills was scheduled for refinancing "when the Farmers Home Administration loan is closed." Later, by nota-

tions on certain ledgers dated April 13, April 27, May 5, May 11, May 18 and June 1, Mr. Harris indicated that the expenses listed on the ledgers would be eligible for reimbursement when the FmHA loan was closed.

The evidence on the record, taken as a whole, clearly indicates that an express contract existed between the FmHA and the bank. However, even though the FmHA had the authority to enter into the contract, and did, in fact, agree to contract terms with the bank regarding the interim financing for the Strupps, the failure of the Strupps' disaster emergency loan to close, unrelated to any intentional or negligent action on the part of the Government, released the FmHA from any contractual obligation to pay off the bank. The parties to the agreement clearly contemplated and agreed that the bank would be repaid any interim funds advanced to the Strupps upon the closing of the FmHA loan. Thus, loan closing was an essential condition precedent before the Government became contractually obligated to repay the bank for the interim advances. The nonoccurrence of such a condition precedent to a contract releases a contracting party from his otherwise binding obligation. *See Korea Development Corp. v. United States*, 9 Cl.Ct. 167, 175–76 (1985).

After the Strupps quitclaimed the Hoerler farm back to the contract sellers, Mr. Harris determined that the loan could not be closed. The Hoerler farm, purchased on a contract for deed by the Strupps, was an integral component of the land to be used by Mr. Strupp to produce crops and was a major part of the security the FmHA intended to take when the loan closed. Moreover, the Hoerler farm was listed by the Strupps in their application for loan and farm plan, and was part of the basis by which the County Committee had certified him eligible for, and the County Supervisor had approved him for, that emergency loan.

The emergency loan program is clearly regulated in the area of security. Specifically, 7 C.F.R. § 1945.69(j) (1981) provides:

*Purchase contracts.* If the real estate offered as security is held under a purchase contract, the following conditions *must* exist:

(1) The applicant *must* be able to provide a mortgageable interest in the real estate.

(Emphasis added.)

In addition, under 7 C.F.R. § 1945.69(a):

(a) *Security* (1) The County Supervisor is responsible for seeing that adequate and proper security is *obtained* and *maintained* * * *.

(Emphasis added.)

The County Supervisor's formal approval of the Strupps' Emergency Loan on April 3, 1981, clearly states that such approval is specifically subject to the conditions presented by FmHA regulations applicable to Emergency Loans. In addition, he noted in the FmHA's running record on April 3, 1981, the day the loan was formally approved, that before closing, title clearance would be required on the Hoerler farm, as well as a vendor's agreement in which the Hoerlers, as the contract sellers, would acknowledge that the FmHA was providing loan funds to make the purchase, and that FmHA would be taking an interest in the portion of the land in which the purchaser held an equity interest.

In the time frame following formal loan approval on April 3, 1981, several factors delayed the loan closing, including the FmHA receiving the information concerning a pending divorce between the Strupps, and a long delay by the escrow agent/attorney in furnishing the necessary title opinion. The loan had still not yet been closed at the beginning of September 1981. Then, on September 10, 1981, without notice to either the FmHA or the bank, Mr. Strupp quitclaimed the Hoerler farm back to Mr. and Mrs. John Hoerler. In his testimony at trial, Mr. Strupp conceded that in deeding the farm back, he basically had "given up." His divorce, his debts, and the long delay in the loan application process had caused him to lose interest in farming. Regardless of the reasons, however, the unilateral action of Mr. Strupp, in quitclaiming the Hoerler farm back to the sellers, made it difficult, if not impossible, for the FmHA to close on the loan. In light of the specific FmHA regulations concerning security, the deeding back of the Hoerler farm was a failure in security justifying the County Supervisor's decision not to close the Strupps' emergency loan. Thus, an essential condition precedent in the agreement was not fulfilled.

In a very small (1–2 percent) number of cases, FmHA loans have failed to close for one reason or another. It is undisputed that both parties to this contract were aware of the distinction between loan "approval" and "closing," as well as the fact that the Strupp loan itself had not yet closed. In addition, the bank was well aware that the approved FmHA loan was to be secured by, among other things, the land. The April 2, 1981 letter clearly spelled that out. Mr. Goss, the bank president, testified specifically that he was aware that satisfactory security in this land was, as far as he was concerned, a condition for the loan.

It is unfortunate that this loan failed, but nevertheless, adequate land security was a required loan condition. Following the failure of that condition, the FmHA was no longer under any legal obligation to go through with the closing. Since loan closing was an essential condition precedent to the contract at issue here, the FmHA is under no contractual obligation to repay the bank for the interim advances. The risk of loss, in this case, must be borne by the bank.

## CONCLUSION

For the reasons discussed herein, the Government prevails in this action, and, accordingly, judgment will be entered dismissing the complaint.

Each party is to bear its own costs.