**NUTRITE CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 97–320C.

United States Court of Federal Claims.

March 31, 1999.

---

Richard C. Cleary, Cleary and Gordon, P.A., Houlton, Maine, attorney of record for the plaintiff.

E. Michael Chiaparas, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Anthony H. Anikeeff, Assistant Director, Commercial Litigation Branch, David M. Cohen, Director, Commercial Litigation Branch, attorneys of record for the defendant.

## OPINION

HORN, Judge.

The plaintiff, Nutrite Corporation (Nutrite), seeks damages from the United States Department of Agriculture, Farmers Home Administration (FmHA), now known as the Farm Service Agency (FSA), for the alleged breach of a loan subordination agreement. Plaintiff filed a complaint in the United States Court of Federal Claims against the United States, consisting of six counts: Count I alleges breach of contract; Count II alleges tortious interference with contract relations; Count III alleges negligent misrepresentation; Count IV alleges fraud; Count V alleges fraudulent transfer; and Count VI alleges false representation. The defendant has filed a motion to dismiss all counts of the complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), as well as for failure to state a claim upon which relief can be granted under RCFC 12(b)(4). The defendant's motion to dismiss is granted.

## FACTS

The facts of this case, as construed most favorably to the plaintiff, are as follows. Daniel and Leslie Emerson (the Emersons) owned a potato farm in Aroostook County, Maine. In 1993, 1994, and 1995, the Emersons borrowed money from the FmHA. In each case, the Emersons executed promissory notes and security agreements in favor of the United States. The United States duly filed and recorded financing statements for the Emersons' crops and machinery each year.

In 1994, the Emersons sought additional funding from Key Bank of Maine (Key Bank). Key Bank approved a loan to the Emersons on the condition that the FmHA subordinate its lienhold interests to Key Bank under 7 C.F.R. § 1962.30, which grants FmHA the authority to subordinate its lienhold interests to subsequent creditors under certain conditions. 7 C.F.R. § 1962.30 (1995). Only one subordination in favor of one creditor may be outstanding at any time in connection with the same security. 7 C.F.R. § 1962.30(b)(4) (1995). On June 29, 1994, Key Bank and the FmHA entered into a subordination agreement (the Key Bank subordination), whereby Key Bank loaned the Emersons $50,000.00 and the FmHA subordinated its lienhold interest in the Emersons' 1994 crop and machinery. On July 13, 1994, the Key Bank subordination was recorded in the State of Maine Registry of Deeds. On September 20, 1995, the Key Bank subordination was stamped "PAID IN FULL" and signed by Brian V. Flewelling, Vice President of Key Bank.

In 1995, the Emersons again sought funding outside of the FmHA. The plaintiff, Nutrite, was willing to loan the Emersons $35,000.00 worth of farm chemicals, again provided that the FmHA subordinate its lienhold interest to Nutrite. On May 31, 1995, Nutrite and FmHA representatives signed a subordination agreement (the Nutrite subordination), whereby Nutrite loaned the Emersons $35,000.00 worth of farm chemicals and the FmHA subordinated its lienhold interest in the Emersons' 1995 crop and machinery. The Nutrite subordination was recorded in the State of Maine Registry of Deeds on August 19, 1996.

The Emersons utilized the Maine Farmers Exchange to sell their farm production. Because the United States had a crop lien against the Emersons, the proceeds of the Maine Farmers Exchange sales were distributed jointly to the United States and Mr. Emerson. Both parties agree that the United States did not distribute any proceeds from the sale of the 1995 crop to Nutrite. The Emersons continued to sell their farm production through the Maine Farmers Exchange until the summer of 1996, at which point they ceased farming. In September, 1996, after the Nutrite subordination was recorded, the Emersons farm equipment was

sold, bringing approximately $9,330.00, which defendant contends in its reply brief, and plaintiff does not dispute, is in the possession of the Emersons' attorney, pending negotiations between Nutrite and the Emersons over several other outstanding loans not at issue in the instant case.

## DISCUSSION

The defendant has filed a motion to dismiss pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction, as well as for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4). The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178, 1996 WL 285759 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 746; *Alaska v. United States*, 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States*, 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to

dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). When considering a motion to dismiss, the court may consider relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

In order for this court to have jurisdiction over plaintiff's complaint, the Tucker Act, as amended, 28 U.S.C. § 1491 (1994 & Supp. II 1996), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1994). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *United States v. Testan*, 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdiction-

al statute for a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45, 1990 WL 60708 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (citing *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States,* 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

## I. Defendant's Motion to Dismiss Count I.

The government has moved to dismiss Count I of the complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), or, in the alternative, for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4). In its motion, the government argues that the Court of Federal Claims lacks jurisdiction to hear Count I because, "although Nutrite alleges a breach of contract action, there was no enforceable contract between the parties." The government's arguments do not articulate a distinction between its motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(4). *See Metzger, Shadyac, and Schwartz v. United States,* 10 Cl.Ct. 107, 109 (1986). When jurisdictional facts are so intertwined with the facts on the merits, the responding party must be given an opportu-nity to develop its facts and the jurisdictional determination must be delayed. *Id.* at 110.

While the burden is on plaintiffs to establish jurisdiction, and it is the duty of this court to satisfy itself throughout the proceeding that it has jurisdiction, the Supreme Court has cautioned against granting motions to dismiss for lack of jurisdiction which are more appropriately a challenge to plaintiffs' statement of a claim for relief: "Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction."

*Id.* at 109 (quoting *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).[1]

Accordingly, this court treats the defendant's motion to dismiss Count I as a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4). In evaluating a motion to dismiss under RCFC 12(b)(4), the court must consider the merits of plaintiff's claims, and may only dismiss the complaint when "it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief."

---

1. The Tucker Act expressly confers jurisdiction on this court to hear claims for breach of contract against the United States. *Trauma Service Group v. United States,* 104 F.3d at 1325. To maintain a cause of action pursuant to the Tucker Act that is based on a contract, there also must be privity of contract between the plaintiff and the United States. *Cienega Gardens v. United States,* 162 F.3d 1123, 1129–30 (Fed.Cir. 1998). Absent privity of contract, the government has not its waived sovereign immunity and the United States Court of Federal Claims does not have jurisdiction to hear the plaintiff's complaint. *National Leased Housing Ass'n v. United States,* 105 F.3d 1423, 1436 (Fed.Cir.1997). When privity of contract is present, there exists, "the type of direct, unavoidable contractual liability necessary to trigger a waiver of sovereign immunity...." *Id.* In the above-captioned case, the matter at issue stems from an agreement between the plaintiff and the government wherein the latter subordinated its lien interests. Thus, there is privity between the parties as to the subject matter of this case.

*Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80).

██ In the instant case, a threshold inquiry is whether FmHA Agricultural Credit Manager Dana Wright had actual authority to bind the United States when he signed the Nutrite subordination. It is a well-established proposition that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *People's Bank and Trust Co. v. United States*, 11 Cl.Ct. 554, 562 (1987) (quoting *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). Under the jurisdiction given to this court by the Tucker Act, liability of the United States under an express or implied contract can be created only by an officer of the government who is, "lawfully invested with the power to make such contracts or to perform acts from which they may be lawfully implied." *People's Bank and Trust Co. v. United States*, 11 Cl.Ct. at 562–563.

The authority of FmHA officials to subordinate the security interests of the United States emanates from 7 C.F.R. § 1962.30 (1995). The government argues that Mr. Wright did not have actual authority to bind the United States under 7 C.F.R. § 1962.30(b)(4), which provides that, "[a] subordination in favor of only one creditor will be outstanding at any one time in connection with the same security." 7 C.F.R. § 1962.30(b)(4) (1995); *see also Exchange Bank of Mound City v. United States*, 9 Cl.Ct. 651 (1986) (holding that FmHA official was without authority to enter into a subordination agreement covering "1982 crops" when a previous subordination also covered "1982 crops").

██ The case at bar is distinguishable from *Exchange Bank*, in that the security covered by the Key Bank subordination is "1994 crop & machinery" and the security covered by the Nutrite subordination is "1995 crop & machinery." Assuming that the machinery involved was all held by the Emersons in 1994, Mr. Wright was without authority to subordinate the government's interest

in the Emersons' machinery, since that interest was already subordinated to Key Bank under the Key Bank subordination. While Nutrite's subordination would not have become effective with respect to the Emersons' machinery until after the Key Bank subordination was satisfied, the parties agree that Key Bank's interest was satisfied before the sale of the Emersons' machinery, thus, there was no relevant priority dispute over the proceeds from the sale of the machinery.

██ The government argues that Mr. Wright also was without authority to subordinate the government's security interest in the Emersons' 1995 crop to Nutrite because the Key Bank subordination extended into the 1995 and 1996 growing seasons by operation of Maine law until the loan was paid in full. In support of this proposition, the government relies on Me.Rev.Stat. Ann. tit. 11, § 9–306(3), which provides that the security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected. Me.Rev. Stat. Ann. tit. 11, § 9–306(3) (West 1998). In the instant case, although the Key Bank subordination extended into the 1995 and 1996 growing seasons, the provisions of Me.Rev. Stat. Ann. tit. 11, § 9–306(3) apply only to the secured interest in the named collateral, the 1994 crop. Me.Rev.Stat. Ann. tit. 11, § 9–306 (West 1998). We find no support for the government's proposition that the insufficiency of the proceeds of the 1994 crop resulted in the Key Bank subordination giving Key Bank priority over the proceeds from the 1995 crop, although there may have been a continuing interest in the machinery owned by the Emersons in 1994. As indicated above, Key Bank's interest was satisfied before the Emersons' machinery was sold in 1996, thus, there was no relevant priority dispute over the proceeds from the sale of the machinery. Accordingly, Mr. Wright had the authority on May 31, 1995 to subordinate the government's interest in the 1995 crop to another eligible lender under 7 C.F.R. § 1962.30, and he acted to subordinate that interest to Nutrite.

██ The government next argues that the Nutrite subordination is not an enforceable

contract between Nutrite and the United States because Nutrite has failed to comply with the "notice filing" system of Maine secured transactions law. Maine secured transactions law provides that, with certain inapplicable exceptions, a financing statement must be filed to perfect a security interest. Me.Rev.Stat. Ann. tit. 11, § 9–302 (West 1998). The requirement to file a financing statement is intended to put a searcher on notice that an underlying security agreement may be outstanding. *In re Cushman Bakery*, 526 F.2d 23, 29 (1st Cir. 1975), *cert. denied*, 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178 (1976). An unperfected security interest is subordinate to the rights of a person entitled to priority under Section 9–312 or one who becomes a lien creditor before the security interest is perfected. Me.Rev.Stat. Ann. tit. 11, § 9–301 (West 1998).

The government argues first that Nutrite did not file the subordination agreement until August 19, 1996, after the proceeds of the 1995 crop had been distributed to Key Bank. Nutrite concedes that it did not file the subordination agreement until August 19, 1996, and, thus, had an unperfected security interest in the 1995 crop before that time. Plaintiff contends, however, that the failure to record its subordination does not impact the relationship between the contracting parties, and that unrecorded security agreements are effective according to their terms between parties with actual knowledge of the transaction under Me.Rev.Stat. Ann. tit. 11, § 9–201 (West 1998). Section 9–201 states, "Except as otherwise provided by the Title, a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." Me. Rev.Stat. Ann. tit. 11, § 9–201 (West 1998). By its terms, Section 9–201 is a default rule which applies when no other provision of Title 9 establishes the requirements for a security interest to be valid. The Uniform Commercial Code Comment to Section 9–201 plainly states that the general rule of Section 9–201 does not apply in cases in which the Article subordinates a security interest because it has not been perfected under Section 9–301. Me.Rev.Stat. Ann. tit. 11, § 9–201,

Uniform Commercial Code Comment (West 1998).

The Nutrite subordination was an unperfected security interest until it was recorded in compliance with Section 9–302, and was not effective against the government before its filing on August 19, 1996, regardless of the parties' actual knowledge of the transaction. *See Pepperell Trust Co. v. Mountain Heir Fin. Corp.*, 708 A.2d 651, 654 (Me.1998) (holding that actual knowledge does not supplant the filing requirements of Chapter 9). Under this section, Nutrite's unperfected security interest in the Emersons' 1995 crop was subordinate to the perfected security interest that the United States held in the 1995 crop and, therefore, the United States was free to keep or distribute the proceeds.

■ The government further argues that the subordination agreement filed by Nutrite on August 19, 1996 fails to satisfy the statutory definition of a financing statement, thus resulting in Nutrite having an unperfected, and, hence, subordinate, security interest to this day. Me.Rev.Stat. Ann. tit. 11, § 9–402 defines a financing statement as follows:

(1) A financing statement is sufficient if it gives the names of the debtors and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral; except that, for purposes of this section, if the collateral is a mobile home the description of collateral must include the location designated by the debtor in the security agreement as the place at which the mobile home is, or is to be, located. A financing statement may be filed before a security interest otherwise attaches. When the financing statement covers timber to be cut; minerals or the like, including oil and gas or accounts subject to section 9–103, subsection (5); or crops growing or to be grown, or when the financing statement is filed as a fixture filing, section 9–313 and the collateral is goods that are or are to become fixtures, the statement must comply with subsection (5). A copy of the security agreement is

sufficient as a financing statement if it contains the above information and is signed by the debtor. A legible carbon, photographic or other reproduction of a security agreement or a financing statement is sufficient as a financing statement if the security agreement so provides or if the original has been filed in this State.

\* \* \* \* \* \*

(5) A financing statement covering timber to be cut or covering minerals or the like, including oil and gas, or accounts subject to section 9–103, subsection (5), or covering crops growing or to be grown, or a financing statement filed as a fixture filing, section 9–313, where the debtor is not a transmitting utility, must show that it covers this type of collateral and the financing statement must contain a description of the real estate. If the debtor does not have an interest of record in the real estate, the financing statement must show the name of a record owner.

\* \* \* \* \* \*

(7) A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

(8) A financing statement substantially complying with the requirements of this section is effective, even though it contains minor errors which are not seriously misleading.

Me.Rev.Stat. Ann. tit. 11, § 9–402 (West 1998).

Nutrite concedes that the only document it filed was the Nutrite subordination agreement. The Nutrite subordination agreement fails to meet the statutory definition of a financing statement because the copy in the record before the court does not contain the debtor's signature, an address of the secured party from which information concerning the security interest may be obtained, the debtor's mailing address, or a description of the real estate on which the crops are to be grown. Accordingly, Nutrite still retains an unperfected interest in the Emersons' 1995 crop, which, by operation of Maine law, is subordinate to the interest of the United States. Me.Rev.Stat. Ann. tit. 11, § 9–301 (West 1998).

■ The plaintiff also argues that the government should be equitably estopped from relying on Nutrite's failure to file its security interest pursuant to Me.Rev.Stat. Ann. tit. 11, § 9–302 because the government "wrongfully withheld permission for the subordination to be recorded." The doctrine of equitable estoppel is a judicial remedy by which a party may be precluded by its own act or omission, from asserting a right to which it otherwise would have been entitled. *See Heckler v. Community Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Although the United States Supreme Court in *Heckler* did not come to a final conclusion as to whether estoppel can be raised against the United States, the Supreme Court appears to suggest that there are limited circumstances in which equitable estoppel is applicable against the sovereign. *Id.* at 60, 104 S.Ct. 2218. The United States Supreme Court stated in *Heckler:*

When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant. Petitioner urges us to expand this principle into a flat rule that estoppel may not in any circumstances run against the Government. We have left the issue open in the past, and do so again today. Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their deal-

ings with their Government. But however heavy the burden might be when an estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present.

*Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. at 60–61, 104 S.Ct. 2218 (footnotes omitted).

▮▮▮ When a claimant raises equitable estoppel against the government, in order to prevail and warrant judicial intervention, the party invoking the doctrine against the United States bears a heavy burden to prove the elements of estoppel. *See id.* at 61, 104 S.Ct. 2218. When estoppel is asserted against the government in the context of a contract dispute, the necessary elements are: (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury. *American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110, 1113 (Fed.Cir.1985); *Emeco Indus., Inc. v. United States*, 485 F.2d 652, 657, 202 Ct.Cl. 1006 (1973).

▮▮▮ With respect to the fourth prong of the test articulated above, the United States Supreme Court has stated that "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. at 63, 104 S.Ct. 2218. The government concedes that Mr. Wright did not release the original subordination agreement to Nutrite for filing until sometime in July, 1996. Nutrite, however, received a copy of the subordination agreement in June, 1995. This was sufficient to begin the filing process, since Section 9–402 provides that a copy of the security agreement is sufficient as a financing statement if it contains the required information described above and is signed by the debtor. Me.Rev.Stat. Ann. tit. 11, § 9–402. Accordingly, Nutrite cannot rely on the doctrine of equitable estoppel to excuse its failure to record a financing statement as required by Maine law. At all relevant times, Nutrite's unperfected security interest was subordinate to the government's perfected security interest. Accordingly, the defendant's motion to dismiss Count I of the complaint for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4) is granted.

## II. Defendant's Motion to Dismiss Counts II–VI for Lack of Subject Matter Jurisdiction.

The defendant has moved to dismiss Counts II–VI of the complaint for lack of subject matter jurisdiction under RCFC 12(b)(1) because these counts sound in tort. It is clearly established that the United States Court of Federal Claims lacks jurisdiction over tort claims. *See Berdick v. United States*, 222 Ct.Cl. 94, 100, 612 F.2d 533, 536 (Ct.Cl.1979). The Tucker Act expressly excludes tort claims from the jurisdiction of the United States Court of Federal Claims. 28 U.S.C. § 1491(a)(1) (1994); *see Brown v. United States*, 105 F.3d 621, 623 (Fed.Cir.1997); *Golden Pacific Bancorp. v. United States*, 15 F.3d 1066, 1069 n. 8 (Fed. Cir.1994), *cert. denied*, 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *Shearin v. United States*, 992 F.2d 1195, 1197 (Fed.Cir. 1993); *Edwards v. United States*, 19 Cl.Ct. 663, 669 (1990). In reviewing the jurisdiction of this court, the United States Court of Appeals for the Federal Circuit has stated:

It is well settled that the United States Court of Federal Claims lacks—and its predecessor the United States Claims Court lacked—jurisdiction to entertain tort claims. The Tucker Act expressly provides that the "United States Court of Federal Claims shall have jurisdiction ... in cases *not* sounding in tort." 28 U.S.C. § 1491(a)(1) (1988) (emphasis added), *as amended by* Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506; *see Aetna Casualty and Surety Co. v. United States*, 655 F.2d 1047, 1059, 228 Ct.Cl. 146 (1981).

*Shearin v. United States*, 992 F.2d at 1197. In its response to the defendant's motion to

dismiss, the plaintiff concedes that Counts II–VI sound in tort and consents to dismissal of those counts. Therefore, Counts II–VI of plaintiff's complaint are dismissed for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1).

## CONCLUSION

Although the allegations asserted by the plaintiff Nutrite of breach of contract by the government establish jurisdiction in this court, the facts alleged in the above-captioned case cannot support a finding that there was an enforceable contract between Nutrite and the government. While FSA Agricultural Credit Manager Dana Wright had the authority to subordinate the government's interest to Nutrite, Nutrite's failure to properly file a financing statement resulted in its interest being subordinate to that of the government. Count I of the plaintiff's complaint must be dismissed. As discussed, Counts II–VI also must be dismissed for lack of jurisdiction in this court. Accordingly, the defendant's motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(4) is **GRANTED** and plaintiff's complaint is, hereby, **DISMISSED.**

IT IS SO ORDERED.